UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROWNSTONE AGENCY, INC. and MURPHY & JORDAN,<br><br>Plaintiff,<br><br>vs.<br><br>EUGENE J. CALLAGHAN, JOHN GLOISTEIN, E & J AGENCY, INC.<br><br>Defendants. | Civil Action No. 1:08-cv-522 (LTS)(FM)<br>ECF CASE |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Donia Sawwan, Esq. (DS/9338)
100 Park Avenue, Suite 1500
New York, New York
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
*dsawwan@foxrothschild.com*

Attorneys for Defendants
Eugene J. Callaghan, John Gloistein,
and E & J Agency, Inc.

Of Counsel:

    Donia Sawwan

    Dominick Bratti (*pending admission Pro Hac Vice*)

RL1 689514v1 02/07/08

## **TABLE OF CONTENTS**

**PAGE**

STATEMENT OF FACTS ........................................................................................................... 1

LEGAL ARGUMENT .................................................................................................................. 9

PLAINTIFFS CANNOT ESTABLISH THE PREREQUISITES FOR THE
ISSUANCE OF A PRELIMINARY INJUNCTION AS A MATTER OF LAW ......................... 9

    A.    Plaintiffs Cannot Establish That They Will Suffer Irreparable Harm
if an Injunction Is Not Issued ................................................................................. 9

    B.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the
Merits ................................................................................................................... 10

    C.    The Balance of Equities Favors the Defendants .................................................. 14

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**PAGE**

*CASES*

Arnold K. Davis & Co. v. Ludemann,
    559 N.Y.S.2d 240 (N.Y. App. Div. 1st Dep't 1990) ................................................. 9, 11, 15

Firemen's Insurance Co. of Newark, New Jersey v. Keating, et als.,
    753 F. Supp. 1146 (S.D.N.Y. 1990) ................................................................................ 9

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,
    596 F.2d 70 (2d Cir. 1979) ........................................................................................... 10

Leo Silfen, Inc. v. Cream,
    328 N.Y.S.2d 423 (N.Y. App. Div. 1972) .................................................................. 11

Levine v. Bochner,
    517 N.Y.S.2d 270 (1987) ............................................................................................ 11

Schneider Leasing Plus, Inc. v. Stallone,
    172 A.D.2d 739, 569 N.Y.S.2d 126 (N.Y. App. Div. 2nd Dept. 1991) ...................... 10

## **STATEMENT OF FACTS**

Defendant Callaghan became employed by Murphy & Jordan, Inc. in or about June 1980 as a coverage technician. (Callaghan Affidavit, ¶1). In or about 2000, Murphy & Jordan, Inc. was dissolved and its successor in interest, Plaintiff Murphy & Jordan (hereinafter referred to as "M&J") was formed as a wholly owned subsidiary of Plaintiff Brownstone Agency (hereinafter referred to as "Brownstone"). (Callaghan Affidavit, ¶2). At that time, Defendant Callaghan became employed by M&J's parent company, Brownstone. (Callaghan Affidavit, ¶3). Brownstone is owned by John Cassara (49%), Bradley Brown (32 2/3%) and Eugene Murphy (16 2/3%). (Callaghan Affidavit, ¶4-5).

When Defendant Callaghan was first hired by Murphy & Jordan, Inc., Murphy & Jordan, Inc. and Defendant Callaghan agreed that Defendant Callaghan would be paid a commission on all business brokered/produced by Callaghan. (Callaghan Affidavit, ¶6). Also at that time, the parties agreed that accounts brokered/produced and/or otherwise serviced by Defendant Callaghan would be divided into two categories: (1) those that belonged to Callaghan (hereinafter referred to as "Callaghan's Proprietary Accounts") and (2) House Accounts belonging to plaintiff (hereinafter referred to as "House Accounts"). Callaghan's Proprietary Accounts were defined as those brokered/produced by Callaghan. (Callaghan Affidavit, ¶7).

When Defendant Callaghan became employed by Brownstone in or about 2000, the parties continued this agreement and it was at all times understood by Defendant Callaghan and Plaintiffs that accounts brokered and/or otherwise serviced by Defendant Callaghan would continue to be divided into two categories: (1) Callaghan's Proprietary Accounts and (2) House Accounts and that Defendant Callaghan would be paid a commission on all business brokered/produced by Callaghan. (Callaghan Affidavit, ¶8-9).

J.A. Insurance Consultants, Inc., (hereinafter referred to as "J.A. Insurance") is a Florida Corporation with its principal place of business located at 110 Phyllis Drive, Old Tappan, New Jersey. (Gloistein Affidavit, ¶2). Defendant Gloistein is the sole owner/stockholder of J.A. Insurance. (Gloistein Affidavit, ¶1). In or about 1992, J.A. Insurance entered into an independent contractor arrangement whereby it would broker insurance for its clients through Murphy & Jordan, Inc. in exchange for commissions. (Gloistein Affidavit, ¶3). It was then agreed among the parties that all accounts brokered by J.A. Insurance through plaintiff would remain clients of J.A. Insurance and Defendant Gloistein (hereinafter referred to as "Gloistein's Proprietary Accounts"). (Gloistein Affidavit, ¶4).

Upon Murphy & Jordan, Inc.'s dissolution in or about 2000, the parties agreed that J.A. Insurance would continue to broker insurance for Gloistein's Proprietary Accounts through Plaintiff M&J in exchange for commissions, which were paid by Plaintiff Brownstone. (Gloistein Affidavit, ¶5-6). In or about 2004, it became clear that Plaintiff M&J was having difficulty appropriately servicing Gloistein's Proprietary Accounts as to insurance coverage which was purchased by said Accounts. (Gloistein Affidavit, ¶7). As a result, it was agreed between J.A. Insurance, Defendant Gloistein and Plaintiff Brownstone that Gloistein would be added to Brownstone's payroll as an employee solely for purposes of servicing said Gloistein Proprietary Accounts as well as certain House Accounts of Plaintiffs as agreed upon by the parties. (Gloistein Affidavit, ¶8).

It was further agreed and understood that Brownstone's employment of Gloistein would not alter the parties' agreement as to Gloistein Proprietary Accounts, and that all accounts brokered by J.A. Insurance would remain the property of J.A. Insurance and Gloistein. (Gloistein Affidavit, ¶9). Subsequent to Gloistein's employment by Brownstone, Plaintiff Brownstone

continued to pay commissions as to such accounts to J.A. Insurance. (Gloistein Affidavit, ¶10). Indeed, J.A. Insurance was issued a 1099 form by Plaintiff Brownstone as to all such commission payments. (Gloistein Affidavit, Ex. A).

At no time during Defendant Callaghan and Defendant Gloistein's employment with Plaintiffs did they enter into any non-competition agreement or other restrictive covenant with Plaintiffs. (Callaghan Affidavit, ¶19; Gloistein Affidavit, ¶12). Rather, Plaintiffs understood that insurance brokerage is not an exclusive business. (Callaghan Affidavit, ¶10-13 and 20; Gloistein Affidavit, ¶14). Clients are free to consult with more than one broker at any one time. (Callaghan Affidavit, ¶21; Gloistein Affidavit, ¶15). Indeed, customers often utilize multiple insurance brokers to either get more competitive quotes and/or obtain a quote from a certain insurance company who does not have a relationship with their current broker. (Callaghan Affidavit, ¶21; Gloistein Affidavit, ¶15). Further, information regarding accounts, rates, and customer names and addresses is readily available in the industry. (Callaghan Affidavit, ¶22; Gloistein Affidavit, ¶16). Moreover, no one at Plaintiffs ever suggested to Defendants Gloistein and Callaghan that such information was confidential or requested that such information be maintained as confidential. (Callaghan Affidavit, ¶22; Gloistein Affidavit, ¶18).

Indeed, in the present case all parties agreed and understood that Defendants were free, either separately and/or in combination with others, to establish and/or continue a business based upon their respective Proprietary Accounts. (Callaghan Affidavit, ¶23; Gloistein Affidavit, ¶19). Further, it was understood and agreed that in such a case, Defendants would continue to work during a mutually agreed upon transition period, and that during such transition period, the parties would provide for the transition of House Accounts to other employees and/or agents of Plaintiffs as designated by Plaintiffs. (Callaghan Affidavit, ¶24; Gloistein Affidavit, ¶19).

3

Moreover, throughout his employment, Callaghan advised Plaintiffs, and specifically, John Cassara and Gene Murphy, of his desire to someday start his own business founded primarily upon his Proprietary Accounts. (Callaghan Affidavit, ¶10-13). Neither Murphy nor Cassara ever objected to Callaghan's plan or suggested that Callaghan should enter into a non-competition agreement. (Callaghan Affidavit, ¶12-13).

One of Callaghan's Proprietary Accounts was Chopper Logistics and its related entities (hereinafter referred to as "Chopper"), which was developed because of Callaghan's expertise. (Callagahan Affidavit, ¶14-16). Callaghan has been working in the insurance industry for twenty-eight years. (Callaghan Affidavit, ¶14). During those twenty-eight years, Callaghan has developed an expertise in the trucking industry and has developed certain accounts in the trucking industry that have always been considered by all parties to be Callaghan's Proprietary Accounts. (Callaghan Affidavit, ¶15).

For many years prior to 2007 throughout his employment with Plaintiffs, Defendant Callaghan received offers of employment from Chopper Logistics and/or its related entities (hereinafter collectively referred to as "Chopper"). (Callaghan Affidavit, ¶17). During his employment with Plaintiffs, Defendant Callaghan advised Plaintiffs of said offers of employment by Chopper. (Callaghan Affidavit, ¶18).

On October 8, 2007, Defendant Callaghan complained to Mr. Murphy about Mr. Cassara's ongoing hostile and abusive behavior and asked that Mr. Murphy make it stop. (Callaghan Affidavit, ¶26). Despite the complaint, the hostile and abusive behavior did not stop. (Callaghan Affidavit, ¶27). Mr. Callaghan again brought Cassara's abuse to Mr. Murphy's attention a little more than a week later. On or about October 17, 2007, Defendant's Callaghan and Gloistein met with Gene Murphy at Harry Hanover's Square Restaurant for lunch.

(Callaghan Affidavit, ¶28; Gloistein Affidavit, ¶20). During that lunch, Defendant Callaghan advised Mr. Murphy that he had liked working at Brownstone but that he could no longer tolerate Mr. Cassara's constant abuse. (Callaghan Affidavit, ¶29; Gloistein Affidavit, ¶21). Defendant Callaghan reminded Mr. Murphy that Chopper had repeatedly offered Mr. Callaghan a position with Chopper, and that as a result of retaliatory/harassing conduct by Mr. Cassara, Mr. Callaghan was considering accepting that offer and opening his own business. (Callaghan Affidavit, ¶30; Gloistein Affidavit, ¶22). Again, Plaintiffs failed to conduct any investigation of the complaint of retaliation/harassment. (Callaghan Affidavit, ¶31).

Also in October 2007, Defendant Callaghan was aware that Cassara and Murphy were contemplating selling Plaintiffs. (Callaghan Affidavit, ¶32). When he discussed that with Mr. Murphy, Mr. Murphy agreed that given the contemplated sale of Plaintiffs, the commissions agreement between Callaghan and Brownstone should be memorialized in writing. (Callaghan Affidavit, ¶33). Despite Callaghan's requests for a written agreement, the commission agreement between the parties was never memorialized in writing. (Callaghan Affidavit, ¶34).

Around this time, Gloistein and Callaghan decided to form their own insurance brokerage agency and E & J Agency, Inc. was then incorporated in the State of New Jersey. (Callaghan Affidavit, ¶35; Gloistein Affidavit, ¶23). Gloistein and Callaghan then applied to the State licensing board for E & J Agency, Inc. to become a licensed insurance broker in the State of New Jersey. (Callaghan Affidavit, ¶36; Gloistein Affidavit, ¶24). However, neither Gloistein nor Callaghan took any further steps and none of their Proprietary Accounts were notified of their new business at that time. (Callaghan Affidavit, ¶37; Gloistein Affidavit, ¶25).

On the morning of December 28, 2007, Defendant Callaghan advised John Cassara by telephone that he had established his own brokerage firm and would be leaving Brownstone.

(Callaghan Affidavit, ¶41). During this telephone call, the parties agreed that pursuant to their preexisting oral agreement, Defendant Callaghan would remain with Brownstone for a mutually agreed upon period of time. (Callaghan Affidavit, ¶42). Mr. Cassara also tried to persuade Callaghan to stay and offered him the option of remaining at Brownstone, but working out of New Jersey should he decide not to follow through with the new business. (Callaghan Affidavit, ¶43).

On that same day, Defendant Gloistein advised Bradley Brown that he was also resigning. (Gloistein Affidavit, ¶28-29). On December 31, 2007, Gloistein arrived at work as scheduled and was granted full access to his computer system (no passwords had been changed) and continued to work as usual. (Gloistein Affidavit, ¶31).

On January 2, 2008, Defendant Callaghan spoke with Mr. Cassara via telephone regarding Callaghan's departure from Brownstone. (Callaghan Affidavit, ¶44). At that time, the parties agreed that Mr. Callaghan would remain employed until on or about February 15, 2008 to provide for the transition of House Accounts. (Callaghan Affidavit, ¶45). Mr. Cassara further stated that in the interim, Plaintiff would provide Mr. Callaghan with a full list of accounts for the purpose of specifically identifying which accounts were Callaghan's Proprietary Accounts and which were House Accounts. (Callaghan Affidavit, ¶46). In accordance with that conversation, on or about the morning of January 8, 2008, Plaintiffs provided Defendant Callaghan with a full list of clients so that the parties could specifically identify and agree upon which clients were Callaghan's Proprietary Clients and which were House Accounts. (Callaghan Affidavit, ¶47). Notwithstanding the parties' understanding that Callaghan would stay during the transition period, on January 8, 2008, Plaintiffs terminated Defendant Callaghan and directed him to terminate Defendant Gloistein. (Callaghan Affidavit, ¶55). Accordingly, Defendant

Callaghan telephoned Defendant Gloistein and notified him that he needed to clear out his desk immediately upon his return. (Gloistein Affidavit, ¶33).

Upon being terminated, Defendant Callaghan questioned Plaintiffs' agent and employee, John Simone, about obtaining his commissions. (Callaghan Affidavit, ¶56). Simone acknowledged that commissions were due and owing and stated that he would get back to Defendant Callaghan regarding payment. (Callaghan Affidavit, ¶57). Neither Simone nor anyone from Brownstone has responded to his request for payment of commissions. (Callaghan Affidavit, ¶58). To date, Brownstone still has not paid Defendant Callaghan the commissions owed. (Callaghan Affidavit, ¶59).

Neither Callaghan nor Gloistein contacted any of their Proprietary Accounts about their new business venture until after their resignation. (Callaghan Affidavit, ¶48; Gloistein Affidavit, ¶35). Nor did they utilize any of Plaintiffs' confidential information either before or after their respective resignations. (Callaghan Affidavit, ¶48; Gloistein Affidavit, ¶35-36). Instead, in approximately January 2008, Callaghan had discussions with Chopper's CEO Joseph Gurtilla and advised him that he was now willing to accept Chopper's offer of employment as a Risk Manager. (Callaghan Affidavit, ¶49).

It was only then that Chopper sent in requests to change the Producer of Record for Chopper's insurance that was underwritten by Crum & Forster. (Callaghan Affidavit, ¶50). Again, Defendants Callaghan and Gloistein acted appropriately. Specifically, at that time, Callaghan advised Chopper that certain policies that they requested and that he had produced would remain with Murphy & Jordan since they were effective prior to Callaghan's resignation from Plaintiffs. (Callaghan Affidavit, ¶51-54; see also e-mail dated January 8, 2008 to Laura McAllister annexed as Exhibit 6 to Plaintiffs' Affidavit of Rafael Ramos.)

Callaghan's and Gloistein's Proprietary Accounts represent a very small percentage of the total profits earned by Brownstone. (Callaghan Affidavit, ¶60-61). Callaghan and Gloistein's Proprietary Accounts result in approximately $1,100,000 in profit each year. (Callaghan Affidavit, ¶60). Brownstone traditionally shows a profit in excess of $22,000,000 each year. (Callaghan Affidavit, ¶61). By contrast, nearly 100% of E & J Agency's profits/anticipated profits will be generate from Callaghan and Gloistein's Proprietary Accounts. (Callaghan Affidavit, ¶62).

## LEGAL ARGUMENT

## PLAINTIFFS CANNOT ESTABLISH THE PREREQUISITES FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION AS A MATTER OF LAW

In order to obtain a preliminary injunction, a moving party must prove: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) that a balance of equities favors the movant. See Arnold K. Davis & Co. v. Ludemann, 559 N.Y.S.2d 240, 241 (N.Y. App. Div. 1st Dep't 1990). However, the issuance of a preliminary injunction is a drastic remedy, that should only be sparingly granted. See Firemen's Ins. Co. of Newark, New Jersey v. Keating, et als., 753 F. Supp. 1146, 1149-1150 (S.D.N.Y. 1990). In the present matter, Plaintiff cannot establish any of these required elements justifying such extraordinary relief and thus the request for the issuance of a preliminary injunction should be denied.

### A. Plaintiffs Cannot Establish That They Will Suffer Irreparable Harm if an Injunction Is Not Issued

The most important factor a movant seeking a preliminary injunction must prove is that it will suffer an irreparable harm if the injunction is not issued. See Firemen's Ins. Co., 753 F. Supp. at 1150. Moreover, in order for the harm to be deemed irreparable, the movant must show that money damages alone will not adequately compensate it for the alleged harm. Id.

In the present matter, the Plaintiffs have only alleged a loss of revenue. Specifically, Plaintiffs state that their claim for irreparable harm is based upon:

> [t]he relief that will be sought in this action is monetary relief . . . that is being sustained by the plaintiffs as a result of the defendants. See Plaintiffs' Affirmation in Support, ¶5.

Plaintiffs have not put forth any evidence that demonstrates that they do not have an adequate remedy for damages based upon their breach of contract, breach of duty of loyalty, and tortious interference with economic injury claims. Indeed, the undisputed evidence demonstrates that

9

even if Plaintiffs could establish some unlawful conduct on the part of Defendants (which they cannot), at best, the alleged loss of commission profits is a mere fraction of Plaintiffs annual profit revenue. (Callaghan Affidavit, ¶60-62). This is not the type of loss that demonstrates irreparable harm. Id. at 1152; see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (disruption of business not sufficient to demonstrate irreparable harm). Accordingly, Plaintiffs request for injunctive relief should be denied.

**B.     Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits**

In support of the application for a preliminary injunction, Plaintiffs rely exclusively on their misapplication of the law regarding fair competition between an employee and his former employer and their unsupported speculation that Defendants engaged in wrongful behavior. The undisputed evidence is that the Defendants did not engage in any unfair competition against Plaintiffs and all of Plaintiffs' claims must fail. First, it is undisputed that Defendants have not entered into any contract of employment and/or a covenant not to compete with Plaintiffs. (Callaghan Affidavit, ¶19; Gloistein Affidavit, ¶12). Thus, Plaintiffs' breach of contract claims fail as a matter of law.

With regard to Plaintiffs' breach of duty of loyalty claims, Plaintiffs rely almost exclusively on insinuation and inference. Plaintiffs assert that the mere fact that Defendants established E & J Agency, Inc. while Defendants were still employees of Brownstone is evidence of some alleged breach of duty. Indeed, contrary to Plaintiffs' argument, it is well-settled that an employee may incorporate a competing business while still employed without breaching any duty of loyalty to his employer. See Schneider Leasing Plus, Inc. v. Stallone, 172 A.D.2d 739, 741, 569 N.Y.S.2d 126 (N.Y. App. Div. 2nd Dept. 1991).

Plaintiffs also allege without any factual support that Defendants misappropriated confidential information. It is undisputed however that there is no evidence that Plaintiffs misappropriated any information, much less "confidential" information. At the outset, it is well-settled that insurance brokers' client lists are not protectable interests, the taking of which would establish a breach of the duty of loyalty. See Levine v. Bochner, 517 N.Y.S.2d 270, 271 (1987). Indeed, in this case, the undisputed evidence is that the contact information for the three customers contacted by Defendants after their resignations is readily available in the insurance industry. (Gloistein Affidavit, ¶16). This type of information discoverable through public means is not confidential. See Arnold K. Davis & Co. 559 N.Y.S.2d at 241.

Likewise, customers are not required to be exclusive to any insurance broker/producer. (Gloistein Affidavit, ¶15). Indeed, customers often utilize several different brokers to obtain competitive price quotes. Indeed, clients are brought to Plaintiffs by independent contractors such as J.A. Insurance. (Gloistein Affidavit, ¶3-9). Plaintiffs simply cannot claim that their customer lists were somehow confidential information. Moreover, in this case, Plaintiffs have not put forth any evidence that they made any effort to keep customer identities secret, which directly contradicts their current position that the lists were confidential. (Callaghan Affidavit, ¶22; Gloistein Affidavit, ¶18).

Moreover, the undisputed evidence is that Defendants did not copy any files, documents or lists before (or after) their resignations from Brownstone. (Callaghan Affidavit, ¶48). Instead, the undisputed evidence is that after years of servicing clients recognized to be proprietary to Defendants, Defendants simply knew the names of their customer contacts. This cannot constitute an improper use of confidential information. See Leo Silfen, Inc. v. Cream, 328

N.Y.S.2d 423, 427 (N.Y. App. Div. 1972)(solicitation of customers from casual memory and years of experience in business not wrongful).

Although Plaintiffs now deny that Defendants' clients were recognized to be proprietary to Defendants, the evidence available thus far clearly proves otherwise. At the outset, it is undisputed that Defendant Gloistein's clients were referred to Plaintiffs through his wholly owned corporation, J.A. Insurance, which operated as an independent contractor to Plaintiffs and which received commission payments from Plaintiffs. (Gloistein Affidavit, ¶3-9; Gloistein Affidavit, Ex. A). Gloistein did not even become an employee of Plaintiff Brownstone's until years later when Plaintiffs could not provide adequate service to Gloistein's Proprietary Accounts that had been referred to them. (Gloistein Affidavit, ¶7-9). Even after Gloistein became an employee, commissions on those accounts were paid to J.A. Insurance as an independent contractor. (Gloistein Affidavit, ¶10). Further, neither J. A. Insurance nor Gloistein had any type of restrictive covenant with Plaintiffs. (Gloistein Affidavit, ¶12). On the contrary, it is undisputed that J.A. Insurance had the right to shop the business to any other insurance broker/producer, as is the custom in the industry. (Gloistein Affidavit, ¶9-15).

Likewise, both Defendants Callaghan and Gloistein have put forth significant evidence that all parties acknowledged Defendants' rights to take their business with them, and that over the years they openly discussed Mr. Callaghan's plans to start his own firm based upon that business. (Callaghan Affidavit, ¶9-10 and ¶28-30; Gloistein Affidavit, ¶9-11 and ¶20-22). After Defendant Callaghan resigned, Mr. Cassara again acknowledged the appropriateness of the conduct. Indeed, after the resignation, Mr. Cassara sent Defendant Callaghan Plaintiffs' customer list for the express purpose of separating Callaghan and Gloistein's Proprietary

Accounts from Plaintiffs' House Accounts, which were to remain with Plaintiffs. (Callaghan Affidavit, ¶47).

Clearly, Plaintiffs cannot now complain they had a proprietary interest in either Gloistein's or Callaghan's Proprietary Accounts. Further, Plaintiffs own actions contradict their claims of some sort of improper actions on the part of Defendants. Indeed, the evidence as submitted by Plaintiffs is to the contrary. It is undisputed that neither Defendant Gloistein nor Callaghan have ever solicited any House Accounts of Plaintiffs. (Callaghan Affidavit, ¶46-48; Gloistein Affidavit, ¶36). Indeed, Callaghan even specifically advised his client Chopper that certain policies that they requested and that Callaghan had produced would remain with Murphy & Jordan since they were effective prior to Callaghan's resignation from Plaintiffs. (See e-mail dated January 8, 2008 to Laura McAllister annexed as Exhibit 6 to Plaintiffs' Affidavit of Rafael Ramos.) This clearly negates Plaintiffs' attempts to depict Defendants of acting improperly. Thus, since Plaintiffs can neither demonstrate that its customer lists were protectable, nor specifically, that they had any proprietary interest in the three clients that are the subject of this application, Plaintiffs' request for a preliminary injunction should be denied.

Lastly, it is well-settled that, in the absence of an agreement to the contrary, an employee is free to compete with his former employer. The undisputed facts as set forth by Plaintiffs demonstrate that there was no solicitation of any clients prior to Defendants' resignations from Brownstone. (Affirmation in Support, Exhibits 3 through 11.) As Plaintiffs set forth, on December 28, 2007, Defendant Callaghan notified Plaintiffs that he was resigning his employment. (Affirmation in Support, ¶19). The undisputed evidence also demonstrates that on that date, Defendant Callaghan advised Plaintiffs that he was establishing his own brokerage agency. (Callaghan Affidavit, ¶41). Plaintiffs responded by printing out a list of clients and

13

asking Defendant Callaghan to review the list and advise as to which of his clients he intended to take with him. (Callaghan Affidavit, ¶46-47). On that same date, one of Plaintiffs' managing directors (Brad Brown) had a conversation with Defendant Gloistein wherein he asked if Gloistein would be interested in taking over for Mr. Callaghan or if he was leaving to go with Callaghan. (Gloistein Affidavit, ¶28-29). Mr. Gloistein advised Mr. Brown that he was leaving to go with Mr. Gloistein. (Id.). Thus, as of December 28, 2007, Plaintiffs were aware that Defendants were resigning and that they intended to work at a competing business they had established. Plaintiffs' own evidence in this matter demonstrates that there was no solicitation of any customer prior to December 28, 2007. Thus, there was no breach of duty of loyalty. Accordingly, Plaintiffs cannot demonstrate a likelihood of success on the merits and their request for injunctive relief should be denied.

### C.    The Balance of Equities Favors the Defendants

Even if Plaintiffs could establish the first two prerequisites for a preliminary injunction, it is clear that the balance of equities favors the Defendants. Plaintiffs, through their business efforts, earn approximately $22,000,000 in commissions each year. (Callaghan Affidavit, ¶60-63). Even if no injunction is entered and even without the three clients' business alleged to be lost to Defendants, Plaintiffs will earn approximately $21,000,000 in commissions. On the other hand, if an injunction is entered, Defendants will effectively preclude Defendants from utilizing their years of experience in the industry and the relationships they have developed in an unprotected insurance industry and will thus preclude them from earning any living. (Callaghan Affidavit, ¶63).

Moreover, it is undisputed that Plaintiffs are not able to service the clients of J.A. Insurance without Defendant Gloistein since Plaintiffs are not licensed brokers in the State of

Florida, which is where the majority of Defendant Gloistein's Proprietary Accounts are originated. (Gloistein Affidavit, ¶38). Accordingly, only Gloistein is able to produce insurance for those clients and, if an injunction was entered, it would not preserve the *status quo*. Instead, if an injunction was entered, it would benefit neither party as neither party would be able to continue to produce insurance for Gloistein's Proprietary Accounts. Likewise, there is no evidence whatsoever that any other business will return to Plaintiff if Defendants are precluded from servicing them. Rather, the business may be lost to both parties forever. This would be devastating to Defendants. (Callaghan Affidavit, ¶60-63). Thus, a balancing of equities favors the denial of the entrance of a preliminary injunction. See Arnold K. Davis & Co., 559 N.Y.S.2d at 241 (no injunction should issue where it would prohibit former employee to utilize contacts and expertise developed during 15 years in the insurance industry)

## CONCLUSION

Based upon the fact that Plaintiffs cannot establish irreparable injury, a likelihood of success on the merits or that the equities favor entering an injunction, Plaintiffs' request for a preliminary injunction should be denied.

Respectfully submitted,

FOX ROTHSCHILD LLP

By: /s/ Donia Sawwan
Donia Sawwan, Esq. (DS/9338)
FOX ROTHSCHILD LLP
Attorneys for Defendants
Eugene J. Callaghan, John Gloistein, and
E & J Agency, Inc.
100 Park Avenue, Suite 1500
New York, New York 10017
dsawwan@foxrothschild.com

Dated: February 6, 2008

15